### 𝖂𝖞𝖙𝖍𝖊𝖛𝖎𝖑𝖑𝖊.

## CITY OF RICHMOND V. I. J. SMITH AND COMPANY, INC,

June 8, 1916.

Absent, Cardwell, J.

1. CONTRACTS—*Bridges—Profile of Bed Rock—"Plus" and "Minus"— "Approximate"—Meaning of Terms.*—The terms "plus" and "minus" and the word "approximate" as used in the profile of the bed rock of a river, furnished prospective bidders to inform them as to existing conditions, and to enable them to form estimates for the purpose of submitting plans, specifications and proposals for a bridge to be built over the river, are intended to cover negligible deviations from entire accuracy, and are about equivalent to the term, "more or less," as used by surveyors.

2. CONTRACTS—*Extra Work—Written Order—Case at Bar.*—The correspondence between the contractor and the city engineer, in the case at bar, in which the contractor promptly notified the city engineer of the necessity for extra work and asked him for instructions and to fix the compensation to be paid the contractor, and the engineer's reply directing the work to be done, but refusing to fix the compensation therefor because he did not think the contractor entitled to extra compensation, under his contract, was a sufficient compliance, in due time, with the provisions of the contract, that "no claim shall be made or allowed for any work alleged to be extra work, unless the same shall be done in pursuance of a written order from the said city engineer at or before the first payment after the alleged extra work is executed."

Error to a judgment of the Hustings Court, Part II, of the city of Richmond, in an action of assumpsit. Judgment for the plaintiff. Defendant assigns error.

*Affirmed.*

The opinion states the case.

*H. R. Pollard,* for the plaintiff in error.

*O'Flaherty, Fulton & Byrd* and *Gunn & Mathews,* for the defendant in error.

KEITH, P., delivered the opinion of the court.

I. J. Smith & Company entered into a contract with the city of Richmond for the construction of a bridge over James river. Differences arose between the parties as to their respective rights, which resulted in an action of assumpsit being brought by the company against the city of Richmond and a judgment in favor of the plaintiff, which is now before us upon a writ of error.

The declaration embraces the common counts in assumpsit and a special count upon the contract between the parties for the construction of the bridge in question. There was a demurrer to the declaration, which involves no question of interest or importance, and which we think wholly without merit.

The special count, as amended states that the city employed the plaintiff to construct a bridge across James river in accordance with the terms of a contract marked Exhibit "A" and made a part of the declaration; that the plaintiff, on its part, fully complied with the terms of the contract, and that while the work was being done the defendant, through its city engineer, ordered the plaintiff to do certain extra work, which is shown upon an account also filed with the declaration and marked Exhibit "B;" that the plaintiff did and performed the extra work at the instance and request of the defendant and as provided in Exhibit "A" with respect to extra work; that it

made claim therefor and called upon the defendant, through the city engineer, to fix the price of said work; but although the city, through its engineer, ordered the extra work to be done, it failed and refused to fix and determine the value and amount of the extra work, which the defendant afterwards accepted, but refused to pay for, although often requested so to do, and still refuses to pay, to the damage of the plaintiff $55,000.

The object of the city was to construct a reinforced concrete bridge, at a cost not to exceed $225,000, and looking to this end it authorized an advertisement to be made on the 30th of November, 1910, by which it invited proposals for plans, designs, drawings and specifications for the erection and construction of such a bridge. A letter of information, dated January 18, 1911, stating what would be required by the committee on streets, was delivered to prospective bidders. The conditions stated were that the plans, designs, detail drawings (drawn to scale), strain sheets and proposals were to be submitted to the committee on streets not later than February 1, 1911, and each proposal was to be accompanied by certified check for $5,000; that the bridge was to be built of reinforced concrete from shore to shore of the river, complete in every respect, and designed to have a forty-four foot roadway and two eight-foot walkways, including railing, and many other details which need not be mentioned; that all piers were to be equi-distant, and the spans of uniform length and height; that the bridge was to be designed so as to vent the river flow of the highest recorded freshet, and to be five feet above the present street surface grades on each side of the river. It was further required of the parties submitting the designs and proposals that the cost should not exceed $225,000, and this was to be for a complete structure in every

respect; and it was further required that if the committee on streets should accept any one of the designs and proposals offered, the party submitting such design and proposal would be required to enter into a contract with the committee for the construction of the bridge under a bond of fifty *per cent.* of the amount of the proposal.   To this paper, stating what the committee on streets required of the bidders, there was appended a note as follows:

"All persons wishing to submit designs and proposals will be furnished with a blue print showing the location of the site, the present bridge and a profile of existing conditions, and parties not wishing to submit plans, specifications and proposals are requested to return all blue prints furnished them by this office."

Among other things, this blue print showed a line from shore to shore extending across the bottom of the river and across Mayo's Island, which was marked "rock," and this line is of great importance in the consideration of this case.   In order to secure a permanent structure, it was essential that the foundations of the piers should rest upon solid rock.   This blue print with the profile was given the contractors to enable them to make an intelligent estimate of the work which they were about to undertake, and they were, of course, guided in their estimates by the depth of the excavation necessary to reach a safe foundation upon solid rock.

During the progress of the work the contractors, Smith & Company, found the solid rock bed of the river to be much below the rock line shown on the plans and profile, and on the 18th of October, 1911, they addressed to the city engineer the following letter:

"Oct. 18, 1911.

"Mayo Bridge.

"MR. CHARLES E. BOLLING, City Engineer,
  "Richmond, Virginia.

"DEAR SIR:

"On the above mentioned job we find the solid rock bed to the James river much below the rock line shown on the plans and profiles; we write to ask if you wish us to excavate down to solid rock or stop at the grade shown on the plan and profile.

"Awaiting your early reply, we beg to remain,

"Yours very truly,

"I. J. SMITH & COMPANY, Inc."

To this letter G. M. Bowers, who signs himself as "resident engineer," replied by letter dated October 20, 1911, as follows:

"Your letter of last evening handed me, addressed to Mr. C. E. Bolling, city engineer, in regards to the depth to be excavated to for foundation of piers and abutments for the Mayo (free) bridge was delivered to me.

"Doubtless you will receive a reply from Mr. Bolling in answer to whether you should excavate only to the elevation as shown on preliminary plan submitted to bidders or to bed rock, regardless of elevation shown on map.

"I wish to say that whatever reason you may have for stopping the excavation for foundation before solid bed rock is reached there is no reason you could give (considering the stability of the work) that would convince me that the proper foundation is other than solid bed rock, and I shall insist upon the excavation being carried to this character of foundation."

On October 23, 1911, the city engineer, Mr. Charles E. Bolling, wrote Smith & Company the following letter:

"Replying to your letter of 18th instant, in which you state you find a solid rock bed in the James river much below the rock lines shown in the plans and profile, and ask if I wish you to excavate down to solid rock or stop at grade shown in plans and profile. I beg to say I wish the excavation carried down to the solid rock bed. See end of clause nine in the specification, as follows: 'The foundations will be on rock. They shall be prepared by removing all sand, mud or other soft material and by excavating to rock bed as shown on plans. Rock surface for foundations may be uneven, but large, inclined rock surfaces must be stepped before concreting is started.' "

This letter from Mr. Bolling was replied to on October 30, 1911, by Smith & Company as follows:

"Yours of the 23rd to hand and of course we shall follow your instructions. As you are aware, we will have to go considerably below the anticipated line shown on your profile, hence we think there ought to be some price agreed upon for such additional work. We will be glad to confer with you as to what would be a fair compensation for the same, or if the committee prefers, we will wait until the total of such work is ascertained."

On October 30, 1911 (the same date as the last letter from Smith & Company), Mr. Bolling wrote Smith & Company a letter in which, after referring to other matters which need not be here considered, proceeds as follows:

"I also have your letter of the 30th, in which you state you have to go considerably below anticipated lines shown on our profile for the foundaiton of Mayo

bridge and as to what would be a fair compensation for same. I am rather of the opinion this is already covered in the specifications and will take this up with you. Mr. Meuser writes me he will be here tomorrow and I will be very glad to bring this matter up at that time."

On November 15, 1911, Smith & Company addressed the following letter to the committee on streets:

"We beg leave to submit to your consideration the following facts as to the foundations for the piers for the new Mayo (free) bridge:

"To all bidders for that work there was furnished, by the city, a profile, showing the foundation line for each pier. The undersigned, as well as other bidders, based their bids upon the facts shown upon the profile, having every reason to believe that the same was accurate as to the information furnished by it. An examination of the plans submitted by us for the proposed bridge, was based upon the foundation line given in said profile.

"When the contract was drawn it stated that the said profile was approximate only, and that the city did not guarantee its absolute accuracy. While this was making a contract different from our bid, yet we did not object to it, being led to believe, as stated, that it was at least approximate. Accepting that word in a fair sense, we signed the contract. But it has developed that the information given as to the foundation lines by said profile, and upon which we based our plans for the work and submitted them to the city, is by no means correct, nor even approximate to the actual foundation lines for the piers. The difference is very marked at many of the piers, and in some instances, requiring double the amount of excavation and concrete work.

"As soon as we ascertained the condition of affairs, we wrote the city engineer on October 18th and called attention to the fact that, in order to reach a proper foundation, we would have to go greatly below the line shown on said profile and also shown on our plans, and asked him whether he desired us to go down below the depth shown on said profile in order to reach proper foundation. On October 23rd he wrote us that he desired us to go down to a 'solid rock bed' and quoted from the contract requiring such a bed.

"On October 30th we wrote to him asking that he would fix a fair compensation for the extra work, which would be caused by our having to go so much below the lines given on the profile and on our plans. On the same day the city engineer wrote to us and stated, 'I am rather of the opinion that this is already covered in the specifications and will take this up with you.' Subsequently Mr. Meuser and Mr. Smith, of our company, discussed the matter with the city engineer. The result of that conference was that the city engineer deemed it a matter which would have to be decided by your committee.

"We therefore request that you will let us present the matter to you at your earliest convenience."

The position, therefore, of Smith & Company is that they were furnished by the city with a blue print showing the profile of the work to be done, and that upon the faith of this blue print they submitted their plans, specifications and proposals, and that in fact they had been misled by that profile so furnished to them, and that in order to secure a safe foundation upon a solid rock bottom they had to excavate a great distance below the point indicated on the profile, and for that work they claim compensation. On behalf of the city it is contended that there was no guaranty

of the accuracy of this profile; that upon its face it was approximate only; that there appeared on the blue print notations in addition to the use of the term "approximate" which showed that the accuracy of the blue print was not guaranteed—as, for instance, where the figures showing the line of the profile were accompanied by the sign "plus" or "minus," as the case might be.

The evidence on behalf of the defendant would indicate that in the opinion of the city any discrepancy that might exist between the point at which the rock bottom was shown upon the profile and the true rock bottom, as it actually exists, would be covered by the expression "approximate," or "plus" or "minus." The city engineer, for instance, was asked by a juror: "Mr. Bolling, will you repeat your meaning of the plus and minus line on your diagram," and in reply he said: "As I understand the language marked on that drawing, it means plus or minus to the solid rock. If the solid rock was above that, it would be plus; if it was down below, it was minus, if there were no figures on there." Juror: "It was give and take?" Witness: "Give and take; it might mean anything; to go to solid rock, according to that drawing." Juror: "It might mean five feet or five inches?" Witness: "That is my opinion."

In this view we cannot concur. The terms "plus" and "minus," and the word "approximate," as used upon that diagram, are intended to cover negligible deviations from entire accuracy, and, as was said by Mr. Whiteley, a witness for the plaintiff, are about the equivalent of the term "more or less," as used by surveyors. When, therefore, the line of bed rock was given as "approximate," it was intended to express the idea that the line, as shown upon the profile, was

nearly but not exactly correct.    See Webster's International Dictionary.

Upon this point, then, the situation seems to be that the blue print was put into the hands of prospective bidders to inform them as to existing conditions, and to enable them to form estimates for the purpose of submitting plans, specifications and proposals; that while the city did not guarantee entire accuracy, it used expressions from which bidders had a right to infer that the profile submitted was substantially accurate.    It appears that during the progress of the work the contractors, when they discovered that additional excavation would be required in order to reach bed rock, which was absolutely essential to a safe structure, without delay notified the city engineer of the fact and asked him for instructions, and to fix the compensation which the contractors were to receive; that the engineer directed—indeed, he could not have done otherwise—that the contractors should go to bed rock, which was accordingly done; but the engineer did not comply with the request that he should state what would be a fair compensation for the additional work, but took the position that it was already covered by the contract, and that the contractors were not entitled to additional compensation.

We think this was a sufficient compliance with that provision of the contract, that "No claim shall be made or allowed for any work alleged to be extra work unless the same shall be done in pursuance of a written order from the said city engineer, and unless also claim be made therefor to the said city engineer at or before the first payment after the alleged extra work is executed."    We conclude that the work was done in pursuance of a written order, and that the demand for compensation therefor was made within due time; and

that Smith & Company thereby became entitled to due compensation for their labor.

These requirements having been met, Smith & Company put witnesses upon the stand, whose testimony, as presented in this record, fully sustains the verdict of the jury.

We have omitted to state that after evidence had been introduced the defendant demurred thereto, so that we are not at all concerned with the preponderance of the proof; but we do not wish to be understood as intimating that in our judgment the proof preponderated in the defendant's favor, but merely that, even if such had been the case, upon a demurrer to the evidence, the proof was quite sufficient to sustain the verdict.

Upon the whole case, we are of opinion that there was no error in the judgment complained of, which is affirmed.

*Affirmed.*